**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **RICHARD BRIGGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| **v.** | ) | **25-11382-FDS** |
| | ) | |
| **TOWN OF ASHLAND, CARA ROSSI,** | ) | |
| **and MICHAEL HERBERT,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION TO DISMISS**

**SAYLOR, J.**

This is a case about allegations of unlawful retaliation in public employment.  Plaintiff Richard Briggs has brought this action against the Town of Ashland; Cara Rossi, Ashland's police chief; and Michael Herbert, Ashland's town manager.  The complaint alleges that defendants retaliated against plaintiff for raising complaints concerning an internal police department investigation into an alleged office prank.  The complaint asserts claims against defendants for (1) violation of plaintiff's constitutional rights, enforceable through 42 U.S.C. § 1983; (2) violation of the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 167; (3) violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, I; (4) intentional interference with advantageous business relations; and (5) negligent infliction of emotional distress.

The complaint was filed in Norfolk County Superior Court, and defendants removed the case to this court based on the federal-law claim.  Defendants have now moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  For the following reasons,

the motion will be granted as to the complaint's one federal claim, and the remaining state-law claims will be remanded to Norfolk County Superior Court.

## I.      Background

Unless otherwise noted, the following facts are set forth as alleged in the complaint.[1]

### A.      Parties

Richard Briggs is a resident of Medway, Massachusetts.  (Compl. ¶ 1).  He began working as a police officer with the Ashland Police Department in 2002, eventually rising to the rank of lieutenant.  (*Id.* ¶ 5).

The Town of Ashland is a municipality located in Middlesex County, Massachusetts.  (*Id.* ¶ 2).

Cara Rossi is the current Chief of Police of the Ashland Police Department.  (*Id.* ¶ 3).

Michael Herbert is the Town Manager of the Town of Ashland.  (*Id.* ¶ 4).

### B.      Factual Background

On September 27, 2022, Chief Rossi provided Lt. Briggs with an incident report concerning Officer Michael Dionne, who had filed an injured-on-duty ("IOD") request.  (Compl. ¶ 7).  In that report, Dionne stated that he was injured when a five-gallon water jug fell out of his locker and landed on his foot.  (*Id.*).  After reading the report, Lt. Briggs became convinced that the water jug had been placed in Dionne's locker as a prank by another officer.  (*Id.* ¶ 8).  According to the complaint, all IOD requests require an investigation to determine the claim's credibility.  (*Id.* ¶ 9).  Chief Rossi told Lt. Briggs that there was no video of Dionne's locker or

---

[1] On a motion to dismiss, the court may properly consider four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

the room in which the water jugs were stored due to the arrangement of security cameras within the station.  (*Id*. ¶ 10).

On October 12, 2022, Chief Rossi again discussed the water-jug incident with Lt. Briggs. She explained that another officer, then-Sergeant Michael Vinciulla, had come to her with information about the incident.  (*Id*. ¶ 12).  Sgt. Vinciulla reported that he had received a text from Dionne claiming that another officer, Sergeant Christopher Alberini, was responsible for the water-jug incident and that it had in fact been a prank.  (*Id*. ¶ 13).  Chief Rossi told Lt. Briggs that she was going to ask Dionne for additional information and that she wanted Lt. Briggs to attend the meeting between the two.  (*Id*. ¶ 14).

Lt. Briggs attended the meeting the next day.  (*Id*. ¶ 15).  At the meeting, Dionne told Chief Rossi that he did not know how the jug got into his locker and that he had not put it there. (*Id*. ¶ 17).  Chief Rossi told Dionne that there were rumors that Sgt. Alberini was responsible for putting the jug in his locker.  (*Id*. ¶ 18).  Dionne replied that he had heard a similar rumor, but that he could not confirm it.  (*Id*.).  According to the complaint, it was common knowledge within the department that Sgt. Alberini "took issue" with personnel leaving their lockers unlocked and would place items inside of them as a deterrent if they were left unlocked or open. (*Id*.).

Chief Rossi then asked Dionne directly if Sgt. Alberini had texted him admitting to putting the jug in his locker.  (*Id*. ¶ 19).  Dionne was reluctant to answer, explaining that Sgt. Alberini was his friend and that he did not "want to jam him up."  (*Id*.).  Chief Rossi asked again, and Dionne admitted to receiving a text from Sgt. Alberini that stated, "I'm sorry I broke your toe."  (*Id*. ¶ 20).  Dionne explained that he thought Sgt. Alberini was joking and was not seriously admitting to putting the jug in his locker.  (*Id*. ¶ 21).  Lt. Briggs asked Dionne if he still

had the text, and Dionne reluctantly admitted that he did.  (*Id.* ¶ 22).  Lt. Briggs instructed Dionne not to delete the text.  (*Id.* ¶ 23).

Chief Rossi and Lt. Briggs spoke after Dionne left the room.  (*Id.* ¶ 24).  According to the complaint, although Chief Rossi said she thought there was no evidence to prove that Sgt. Alberini had placed the jug in Dionne's locker, Lt. Briggs insisted that Internal Affairs investigate the matter.  (*Id.* ¶¶ 24-25).  Chief Rossi then received a text from Sgt. Alberini asking her to call him, at which point Lt. Briggs left the room.  (*Id.* ¶ 26).

A few weeks later, Chief Rossi again brought up the water-jug incident with Lt. Briggs. (*Id.* ¶ 27).  The complaint alleges that she again raised concerns about the lack of video evidence, but Lt. Briggs reiterated his belief that an investigation was required.  (*Id.* ¶¶ 27-35).

The next day, Sgt. Alberini emailed Chief Rossi and Lt. Briggs asking if he and a fellow officer could attend a firearms-licensing class.  (*Id.* ¶ 36).  Lt. Briggs replied to Chief Rossi explaining that he believed they should "hold off" until Chief Rossi decided how the water jug investigation should proceed.  (*Id.* ¶ 37).  Chief Rossi allegedly replied to Lt. Briggs and said, "As you are in charge of Internal Affairs, I ask that you follow the policy, specifically, section IV, subsection A."  (*Id.* ¶ 38).[2]

According to the complaint, Lt. Briggs interpreted that email as an instruction to conduct an internal-affairs investigation.  (*Id.* ¶ 39).  He believed, however, that he was conflicted out of conducting such an investigation because he would have to interview Chief Rossi as part of the investigation due to her interactions with Dionne and Sgt. Alberini.  (*Id.* ¶¶ 39-40).

---

[2] The complaint does not allege what this policy provision states, or in what document or manual it was located.

According to the complaint, as a result of that concern, Lt. Briggs contacted and met with Michael Herbert, Ashland's town manager, that same day.  (*Id*. ¶ 41).  Lt. Briggs explained the events surrounding the water-jug incident to Herbert at that meeting, and shared his concern about personally investigating the matter because Chief Rossi's own involvement made her a witness.  (*Id*. ¶¶ 42-51).  Lt. Briggs further explained that he was also personally a witness and complained that Chief Rossi may not have followed the department's internal-affairs policy during the initial investigation.  (*Id*. ¶¶ 51-52).

According to the complaint, Herbert responded that it was inappropriate for Lt. Briggs to speak with him without Chief Rossi's knowledge.  (*Id*. ¶ 53).  Lt. Briggs explained that he believed he was following the chain of command and suggested that Herbert invite Chief Rossi into the meeting.  (*Id*. ¶ 54).  The complaint alleges that Herbert then insinuated that Lt. Briggs had a "personal vendetta" against Sgt. Alberini, which Lt. Briggs denied.  (*Id*. ¶ 55).  Despite his initial hesitation, however, by the end of the meeting Herbert agreed that the matter would be better investigated by a third party.  (*Id.* ¶ 56).  According to the complaint, Herbert told Lt. Briggs to reply to Chief Rossi's email and to copy him and the human resources director because that "[would] cover [him] in terms of Whistleblower too."  (*Id*. ¶¶ 57-58).

On November 4, 2022, Lt. Briggs sent the following reply to Chief Rossi's email:

> Thank you for the clarification but are you looking for me to conduct an investigation?  It was my understanding that you were already handling the matter.  As we discussed on Wednesday, (given the totality of the circumstances involved), this investigation should be conducted by an outside source at this point.  I would strongly encourage you and the Town Manager to consider seeking the services of a third-party investigator.

(*Id.* ¶ 60).

Chief Rossi replied "I will see you Monday morning at 0900 in my office to discuss this."  (*Id*.).

On November 7, 2022, Lt. Briggs met with Chief Rossi. (*Id.* ¶ 61). According to the complaint, Chief Rossi was visibly angry because she had learned that Lt. Briggs had met with Herbert without her knowledge. (*Id.*). She asked Lt. Briggs if he thought it was a "good decision" to speak to the town manager without going to her first. (*Id.* ¶ 62). The complaint alleges that Lt. Briggs explained that he had gone to her multiple times to request a third-party investigation and that he felt going to Herbert was appropriate give the circumstances. (*Id.*). Chief Rossi then allegedly began to "chastise" Lt. Briggs for his "perceived shortcomings" and because he had been "anything but helpful" to her. (*Id.*). According to the complaint, Chief Rossi had never been critical of Lt. Briggs's work until after he had spoken with Herbert. (*Id.* ¶ 63).

Chief Rossi then allegedly accused Lt. Briggs of not wanting her at the police department, which Lt. Briggs said was false. (*Id.* ¶ 64-65). The complaint alleges that Chief Rossi then grew even more angry and told Lt. Briggs, "How can I make you a Deputy Chief when I can't trust you?" (*Id.* ¶ 65-66). Lt. Briggs again explained that he went up the chain of command to Herbert because he felt that investigating the situation himself would have created a conflict of interest. (*Id.* ¶¶ 67-68). Chief Rossi then allegedly asked Lt. Briggs what his intentions were with the department, to which he replied that he wanted to finish his final four-and-a-half years without aggravation, frustration, or stress. (*Id.* ¶ 70). Chief Rossi again stated, "[h]ow can I recommend you for the Deputy Chief's position when that is your goal?" (*Id.* ¶ 71). According to the complaint, she then repeated that she felt undermined by Lt. Briggs going to Herbert and accused him of having a "personal vendetta" against Sgt. Alberini, which Lt. Briggs again denied. (*Id.* ¶¶ 72-74). He then asked where she heard it from, to which Chief Rossi allegedly replied that she heard it from Herbert. (*Id.*). Chief Rossi allegedly concluded the

meeting by stating again that the Town would hire a third-party investigator, but that doing so would open the Town up to liability.  (*Id.* ¶ 75).

That investigation was conducted by Katherine Feodoroff, an outside attorney, who interviewed Lt. Briggs on January 6, 2023.  (*Id.* ¶ 76).  On February 27, 2023, Internal Affairs opened another investigation against Sgt. Alberini for a separate incident after a complaint concerning unprofessional behavior.  (*Id.* ¶¶ 77-78).  According to the complaint, Lt. Briggs informed Chief Rossi that he would conduct that investigation but that he was concerned because of the accusation that he had a vendetta against Sgt. Alberini.  (*Id.* ¶ 79).  Chief Rossi allegedly expressed her confidence in Lt. Briggs's ability to be fair.  (*Id.*).  While under investigation and on IOD leave, Sgt. Alberini was promoted to lieutenant; he was eventually approved for medical retirement before the second investigation commenced.  (*Id.* ¶ 80).

On March 1, 2023, Lt. Briggs was informed that Feodoroff had finished her investigation and concluded that the allegations regarding the water-jug incident "were not sustained or unfounded."  (*Id.* ¶ 81).[3]  On March 3, 2023, Chief Rossi told Lt. Briggs that his promotion to Deputy Chief was being delayed due to staffing-shortage issues.  (*Id.* ¶ 83).  According to the complaint, however, despite the staffing issues, Chief Rossi said that the Town was planning to promote Sgt. Vinciulla to lieutenant and another officer to sergeant immediately.  (*Id.* ¶ 84).  The complaint alleges that the Town refused to promote Lt. Briggs in retaliation for his complaints to Chief Rossi and Herbert.  (*Id.* ¶ 85).

---

[3] It is unclear if this is intended to mean that the allegations were neither "sustained" nor "unfounded"— that is, neither proved nor disproved.

According to the complaint, further retaliation allegedly came when it was time to negotiate Lt. Briggs's future salary as Deputy Chief.[4]  On July 12, 2023, Lt. Briggs met with Herbert, Chief Rossi, and Human Resources Director Katherine Bird in Herbert's office.  (*Id.* ¶ 86).  The Town initially offered a salary of $137,000, which Lt. Briggs was able to negotiate to $140,000.  (*Id.* ¶ 88).  The Town declined to increase its offer above $140,000, and Herbert explained that they thought that offer was "fair."  (*Id.* ¶¶ 88-89).

According to the complaint, Herbert then threatened to remove significant stipends from Lt. Briggs's current salary if he did not accept the Deputy Chief position.  (*Id.* ¶ 90).  Specifically, Herbert allegedly threatened that Lt. Briggs would lose the $6,000 lieutenant's stipend he had been receiving since October 2009, that he would lose his $4,000 executive officer stipend, and that the $8,700 accreditation manager's stipend he was receiving would go to Sgt. Vinciulla, who was now the accreditation manager.  (*Id.* ¶¶ 93-94, 96).  According to the complaint, before Lt. Briggs raised complaints in November 2022, Chief Rossi had told him that both he and Sgt. Vinciulla would receive the accreditation stipend.  (*Id.* ¶ 95).  Lt. Briggs replied that he would consult legal counsel to determine if the stipends could be taken away from him, and that he believed that Herbert was trying to force him to accept the Deputy Chief position at the town's proposed salary by removing his stipends.  (*Id.* ¶¶ 97-98).

Lt. Briggs then stated that he was surprised that the Town was trying to reduce his salary given Herbert's high salary.  (*Id.* ¶ 99).  According to the complaint, when his salary was mentioned, Herbert became angry, turned red, and started yelling at Lt. Briggs that he is "one of the lowest paid [t]own [m]anagers in the Metrowest and [he's] expected to do more work than

---

[4] The complaint does not allege what change in circumstances, if any, led Lt. Briggs's promotion to Deputy Chief no longer being delayed.

any of them." (*Id.* ¶ 100). He then allegedly told Lt. Briggs to get his "f****g facts straight!" (*Id.*). He also allegedly asked whether he was clear, to which Lt. Briggs nodded affirmatively, and he again asked whether he was clear in an "extremely angry tone." (*Id.*).

On July 17, 2023, Lt. Briggs emailed Bird, the HR director, declining the Deputy Chief position. (*Id.* ¶ 101). He explained in that email that he believed he was treated unfairly and unprofessionally and that he was subjected to inappropriate and hostile language from Herbert. (*Id.* ¶ 102). On September 5, 2023, Lt. Briggs received a notice of "wage adjustment" from Herbert that informed him that the "lieutenant stipend" and "executive officer stipend" were being removed from his salary beginning October 20, 2023. (*Id.* ¶¶ 104-05).

According to the complaint, Sgt. Vinciulla subsequently accepted the Deputy Chief position and now receives a salary "drastically" higher than the $140,000 offered to Lt. Briggs. (*Id.* ¶¶ 106-07). On November 14, 2023, during a meeting with Sgt. Vinciulla and Chief Rossi, Lt. Briggs was informed that his accreditation manager's stipend would be taken away and given to Sgt. Vinciulla instead. (*Id.* ¶ 108). During that meeting, Chief Rossi allegedly told Lt. Briggs that he had "made it clear" to people both within and outside the department that he intended to retire in a few years. (*Id.* ¶ 109). The complaint alleges that Lt. Briggs asked why his potential retirement impacted the decision to remove his stipends, which Chief Rossi allegedly refused to answer. (*Id.* ¶ 110).

### C.    **Procedural Background**

Plaintiff filed this suit on April 11, 2025, in Norfolk County Superior Court. Defendants removed the case to this court on May 15, 2025, pursuant to 28 U.S.C. § 1441. Defendants have now moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## II.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must "take the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in the plaintiff's favor."  *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023) (quoting *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022)) (citation modified).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Discussion

### A.   42 U.S.C. § 1983 (Count 1)

The complaint asserts that defendants deprived plaintiff of his rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution.  Plaintiff's opposition, however, addresses only the First Amendment claim and provide no support for the contention that defendants' conduct also violated his Fifth and Fourteenth Amendment rights.  For that reason, the Court will deem those claims to be waived, and analyze only whether the complaint states a claim for a First Amendment violation.

The complaint does not define the contours of plaintiff's First Amendment claim with particularity.[5]  It is not clear precisely what speech he alleges resulted in retaliation, nor what precise actions were taken as a result.  But the general contours of the claim appear to be that plaintiff's promotion to Deputy Chief was delayed; that he was offered a lower salary for the Deputy Chief position than he otherwise would have been; and that his compensation as a lieutenant was later reduced, and that those actions were all in retaliation for raising concerns to Chief Rossi and Herbert about the water-jug incident with Dionne and the subsequent investigation.  Defendants contend that plaintiff's speech was not protected by the First Amendment because of his duties as a public employee.

It is well-established that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  At the same time, however, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).

Courts in the First Circuit apply a three-pronged test to determine "whether an adverse employment action against a public employee violated [the employee's] First Amendment free speech rights."  *Bruce v. Worcester Regional Transit Auth.*, 34 F.4th 129, 135 (1st Cir. 2022)

---

[5] The complaint's allegations concerning the First Amendment claim read as follows:  "In relation to the illegal and improper action set forth above [in the complaint] depriving Plaintiff of his property and liberty interests without due process of law, which actions were taken by Defendants acting under color of state law in depriving Plaintiff of his rights under the First . . . Amendment[] to the United States Constitution not to be deprived of freedom of speech  . . . .  By engaging in these improper actions contrary to Plaintiff's constitutional rights, Defendants have violated 42 U.S.C. § 1983."  (Compl. ¶¶ 114-15).

The complaint does explicitly allege that "the Town's refusal to promote [p]laintiff to the rank of Deputy Chief was in direct retaliation for his complaints to Chief Rossi and Town Manager Michael Herbert."  (*Id.* ¶ 85). But the complaint also includes allegations concerning the negotiations for plaintiff's salary as Deputy Chief, including the allegation that Herbert threatened plaintiff with a reduction in salary if he did not accept the Deputy Chief position.  (*Id.* ¶ 90).

(quoting *Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019)).  The first prong asks "whether the public employee [1] spoke as a citizen [2] on a matter of public concern." *Id.*  The second prong asks whether, "if the employee did so, the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*  This requires "balanc[ing] the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Decotiis v. Whittlemore*, 635 F.3d 22, 29 (1st Cir. 2011) (quoting *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)) (citation modified).  If that balance favors the employee, the third prong then requires consideration of whether "the protected expression was a substantial or motivating factor in the adverse employment decision." *Bruce*, 34 F.4th at 135.  Even if the employee satisfies all three prong of the test, the employer may defeat the claim by showing that "it would have made the same [adverse employment] decision regardless of the protected expression." *Id.*

Starting with the first prong, it is clear that plaintiff spoke on a matter of public concern. Multiple courts have recognized that issues of public corruption or malfeasance by government employees readily qualify as issues of public concern. *See Lane v. Franks*, 573 U.S. 228, 241 (2014) ("The content of [plaintiff's] testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern."); *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *see also Decotiis*, 635 F.3d at 30 ("Where speech relates to a matter of inherent public concern, such as official malfeasance or the neglect of duties, [the matter-of-public-concern] inquiry is confined to the subject matter of the speech.").  There can be little

doubt that speech concerning a potential cover-up of the circumstances of a police officer's injury involved a matter of public concern.

Proof of the first prong, however, also requires a showing that plaintiff "spoke as a citizen," not as an employee, when he engaged in the relevant speech.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Bruce*, 34 F.4th at 136 (quoting *Garcetti*, 547 U.S. at 421).  And in "determining whether an employee spoke 'pursuant to their official duties,'" a court "must focus on whether the speech was 'part of what' the employee was 'employed to do' rather than merely whether the employee engaged in the speech 'at work.'"  *Id.*

To determine whether plaintiff spoke as an employee or a citizen, the Court must first identify his official responsibilities.  *Decotiis*, 635 F.3d at 31.  In identifying those responsibilities, "the proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description."  *Id.* (internal quotation marks omitted) (quoting *Mercado–Berrios v. Cancel–Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)).

The next step is to ask whether "the speech at issue [was] made pursuant to [the employee's] responsibilities."  *Id.* at 31 (quoting *Mercado–Berrios*, 611 F.3d at 26).  "To determine whether such speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech."  *Id.*  The First Circuit has identified several non-exclusive factors that are instructive:  (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [his] place of

employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of [his] employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.*

Under that standard, plaintiff's statements to Chief Rossi and Herbert were clearly made in his capacity as an employee, not as a citizen. As for his official responsibilities, the complaint provides limited detail, but it appears that conducting internal-affairs investigations was one of them. Even without any allegations concerning his official job description, the email from Rossi to plaintiff noting that he was "in charge of Internal Affairs" is strong evidence that conducting such investigations was one of "the duties [plaintiff] actually [was] expected to perform." *See Decotiis*, 635 F.3d at 31.

It is likewise clear that the speech at issue was made pursuant to those responsibilities. The most determinative factor is that plaintiff apparently believed that he was reporting up the chain of command when he spoke to both defendants. As his immediate superior, Chief Rossi was clearly within the chain of command, and, on several occasions, the complaint alleges that plaintiff understood Herbert to be within the chain of command as well. (Compl. ¶ 54 ("Plaintiff explained [to Herbert] that he was following the chain of command and suggested [d]efendant Herbert invite Chief Rossi to sit in on their meeting); *id.* ¶ 68 ("Plaintiff explained [to Rossi] that he felt that he needed to move up the 'chain of command' as a result of his concerns.")). Although plaintiff tries to rebut this point in his opposition, the portion of the complaint to which he cites only states that Chief Rossi characterized his action as "go[ing] behind her back . . . to the Town Manager," not that plaintiff did not *himself* understand Herbert to be within his chain of command. (Pl.'s Opp. 10 (quoting Compl. ¶ 62)). And other courts have recognized that where

14

a police officer brings concerns to the attention of those in town government who sit above the police chief, he does not speak outside his chain of command. *See Thomas v. Town of Salisbury*, 277 F. Supp. 3d 161, 173 (D. Mass. 2017); *see also Ross v. Breslin*, 693 F.3d 300, 307 (2d Cir. 2012) ("Taking a complaint up the chain of command to find someone who will take it seriously does not, without more, transform speech into protected speech made as a private citizen." (citation modified)). The complaint itself makes clear that plaintiff understood Herbert to be within his chain of command, and therefore this factor weighs in favor of finding that the speech was made pursuant to plaintiff's responsibilities.

Other factors also support that conclusion. Plaintiff's speech "derived from special knowledge obtained during the course of [his] employment," because he learned about the incident involving Dionne and Sgt. Alberini in his role as a lieutenant in the police department. Furthermore, he clearly represented his employer when he spoke to Herbert; according to the complaint, he sought guidance about how to conduct an internal investigation within the police department, something he could only do by virtue of his position as a police officer. (Compl. ¶¶ 41-52). For similar reasons, there is no "citizen analogue" to the speech at issue here: no private citizen would reasonably ask the town manager how best to conduct an internal-affairs investigation within the police department. *See Oberg v. City of Taunton*, 972 F. Supp. 2d 174, 196 (D. Mass. 2013) ("A public employee's speech focusing on the events of the employee's workplace in the context of fulfilling official duties 'is the quintessential example of speech that owes its existence to a public employee's professional responsibilities and thus is not protected under the First Amendment.'" (quoting *O'Connell v. Marrero-Recio*, 724 F.3d 117, 123 (1st Cir. 2013))).

15

Some of the remaining factors are perhaps less clear.  For example, the complaint does not clearly allege where the conversation between plaintiff and Herbert took place (although it likely took place behind closed doors).  Nor does the complaint clearly address whether plaintiff was commissioned or paid to make the particular speech in question (although that is surely not true).  Nonetheless, on balance, the factors strongly support finding that plaintiff's speech was made in his capacity as an employee, not as a citizen, and therefore does not receive First Amendment protection.  The First Amendment retaliation claim therefore fails at the first prong of the analysis.

"[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).  Had plaintiff gone to the media to raise concerns about what he thought were fraudulent IOD requests within the Ashland Police Department, and had defendants taken the same adverse employment actions against him, perhaps a different conclusion might be reached.  But that is not what plaintiff did here.  And whether or not the complaint alleges inappropriate or wrongful behavior by defendants, their actions do not represent a constitutional violation.  Therefore, the motion to dismiss will be granted as to Count 1 of the complaint.

### B.    Remaining State-Law Claims

Because the only federal question in the case will be dismissed, the Court must determine whether to exercise supplemental jurisdiction over the remaining state-law claims.

If a complaint fails to state a viable claim under federal law and jurisdiction over the remaining claims depends solely on supplemental jurisdiction, a "district court has discretion to decline to exercise supplemental jurisdiction." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); 28 U.S.C. § 1367(c).  In so doing, the court "must take into account

16

considerations of judicial economy, convenience, fairness to the litigants, and comity." *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) ("[I]t can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the remaining state-law claims are for violations of the Massachusetts whistleblower statute, the Massachusetts Civil Rights Act, and claims for intentional interference with advantageous business relations and negligent infliction of emotional distress. Those claims—particularly the whistleblower claim, which derives from state policies affording greater protection than federal constitutional law—raise substantial questions of state law and would be better addressed by the state courts. In addition, this case is still in an early stage, with the defendants not yet having answered the complaint and no discovery having been taken. Under the circumstances, all relevant factors weigh in favor of declining to exercise supplemental jurisdiction and remanding the case to state court. Therefore, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.

## IV.    Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part as to Count 1. The case is hereby REMANDED to the Norfolk County Superior Court. The Court

17

does not reach defendants' motion to dismiss as to Counts 2-5, which will remain pending after remand.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 30, 2026                         United States District Judge

18